Case No. 245514, Jeff Kean v. Brinker International Inc. et al., Argument not to exceed 15 minutes per side. Ms. Freeman, you may proceed. Good afternoon, Your Honors, and may it please the Court. Emma Freeman for Appellant Jeff Kean, and I'd like to reserve three minutes for rebuttal. At 59 years old, Jeff Kean was the oldest Chili's restaurant manager in his region. Brinker International abruptly fired Mr. Kean and replaced him with an inexperienced 33-year-old, even though Mr. Kean had stellar performance reviews and a thriving restaurant. This is a quintessential jury case, Your Honors, for three reasons. First, Kean presented ample affirmative evidence for a jury to infer age discrimination. Second, Kean showed that Brinker's proffered reason was pretext, a cover-up for discrimination. Finally, Brinker's case is paper-thin. It relies on a Frankenstein document called the TMR Report that has no valid authentication and that a jury could give zero weight. Brinker's sole termination reason was culture, which this Court has frequently said can conceal a discriminatory motive. Brinker destroyed unknown amounts of relevant evidence wholesale, and all of Brinker's witnesses had near-total memory loss. Only a jury can resolve this case. This Court should reverse the District Judgement to Brinker. Did Brinker ever explain what they meant by culture? Judge Moore, Brinker had a number of metrics that, in the ordinary course, it said would impact its assessment of culture. Anything from turnover to profitability to a restaurant's cleanliness to more subjective factors like speaking to customers, speaking to guests, speaking to other employees, and key was restaurant visitation. But in Mr. Kean's case, and only in Mr. Kean's case, Brinker disclaimed reliance on any of those objective or subjective criteria, which goes directly to pretext, Your Honor. So, and I'm familiar with the record, but just to clarify, did Brinker have any adverse reports on Mr. Kean in terms of these more specific culture evaluations? No, Your Honor. When you look at the metrics for culture that Brinker ordinarily relied on, Mr. Kean was an extremely strong performer. The performance evaluations that we have available that weren't destroyed by Brinker's bulliation show that he was an excellent performer. The KPI, Key Performance Indicator reports, show solid culture. And the My Employee Engagement surveys, most of all, as late as 2018, show that 100% of the participating employees felt that Mr. Kean was a manager who cares. They felt he respected them. They felt that he created a warm, positive, team-like environment. Those were the words that Mr. Kean's employees and fellow colleagues were using to describe the culture that he created. So, Your Honor, you know, Brinker has put forward a view of culture at Brinker's Restaurant that's different. But ultimately, that's for a jury to decide. Even if a jury could credit some of the material from the TMR report, which I'll talk about more in a moment, it certainly wouldn't be required to do so. And that would be the only way that Brinker could win as a matter of law. But this isn't a case that can be resolved as a matter of law. So let me start with some of the affirmative evidence of discrimination that Mr. Kean put forward, and then I'll return to pretext. Mr. Kean endured an array of ageist comments made by general managers and supervisors. He was called Grandpa. He was called Pops. Old Man. Old Fart. Were those from a decision-maker, though? I thought those were, I mean, certainly they were comments that were made by co-workers or whatever. But what about from the decision-makers? You're right, Judge Nalbandi, in that those comments were not from the direct decision-makers, from Marcia Gilbert or Rich Kissel. But of course, as this Court has said in the Yersegovich case and many since, they can still be relevant and probative to pretext, even if they weren't made by the key decision-makers. And here, another piece of affirmative evidence that Kean put forward, three witnesses testified that Brinker had a pattern of replacing older employees with younger ones, and citing culture as the reason. So I would say that the relevance of the ageist comments, even though they weren't made by the direct decision-makers here, it went to corporate vision, it went to corporate's desire to age down so that it could appeal to millennial customers, which is something that it explicitly... I mean, if somebody just, I mean, you know, there's banter between people at work all the time. Somebody calls somebody Pops, my clerks call me Pops or whatever. I mean, I don't know how you can... Okay, so that, how does that say, oh, well, they're definitely, it's an environment where there's age discrimination. I mean, I'm just trying to figure out which to leave there. Certainly, Your Honor. And if the ageist comments, if any of them or even those comments taken together was our only evidence, then we would be in a very different situation. But this is a totality case. You have ageist comments, you have a systematic outing of older employees in an effort to age down, you have the targeting of millennials. Mr. Keene had been shunted into an employee categorization called seasoned professional that Brinker conceded meant Keene was not promotable. And that's just the affirmative evidence. When you add to that the pile of evidence that Mr. Keene put forward that shows pretext, what you have is a case for a jury to decide. You have to look at each piece of the puzzle in conjunction. And I would say, Your Honor, that this is an extraordinarily unusual employment case. You have three pieces I mean, the district judge didn't seem to think there was a pile of evidence on pretext. So I guess maybe could you elaborate a little bit? I certainly can. There are multiple categories of pretext evidence. First would be the fact that Brinker violated at least three of its own internal policies. And those violations are something that this Court has said again and again can show pretext, can show a cover up for discrimination. Brinker had a progressive termination policy, didn't follow it with respect to Mr. Keene. It jumped right to termination. No one ever told him we had concerns with your performance, let's have a sit down, maybe a performance improvement plan. As I was discussing with Judge Moore, Brinker said we rely on all of these criteria when we assess a restaurant's culture. No one so much as visited Mr. Keene's Chili's Outpost at Murfreesboro before Marsha Gilbert walked in unceremoniously, having never set foot there before, and told Mr. Keene to pack his things and go. Turning to the TMR report, that document is inadmissible at the outset, and we can discuss the authentication issues and the reliability issues there. But even if that document is in play, the circumstances surrounding its creation were themselves so suspicious, so unusual, that a jury could look to that as additional evidence of both pretext and of affirmative age discrimination. So how was this TMR report created? The short answer, Your Honor, is nobody knows. Was everyone from the Brinker's side disavowed remembering anything about it? Is that right? That's right. Literally every single one of Brinker's witnesses, all three decision makers and anyone else who offered a declaration said, I remember nothing about Mr. Keene or my role in his termination. Brinker's position is that a woman named Kristen Stouffer, who was from HR, copied and pasted certain emails that she was CC'd on that they contend relate to Mr. Keene's termination. Stouffer put in a declaration saying, I don't remember this document. I don't remember my role in it, and if I had one at all. No one can say when it was created. Can you testify at all about, I customarily created these kinds of documents whenever we terminated anybody. It was my practice to do that. I don't recall her even saying that. Is that right? That's correct, Your Honor. And this would be R48-21 is the Stouffer declaration, and you can see it's a photograph of one page. It's a six-line declaration that contains  Oh, right. That's just a picture of a declaration. A picture of a declaration. She wasn't deposed. She said virtually nothing. Another employee also named Kristen, this one Kristen Obrera, said, I have personal knowledge that Kristen Stouffer copied and pasted certain emails. And she tried to represent that the TMR report reliably captured every relevant document containing information about Mr. Keene's determination. That, quite simply, Your Honor, is not authentication under Rule 901. No one has sufficient personal knowledge. Rich Kissel, who is the vice president of the region, looked at the so-called TMR report and said, I don't know what kind of document this even is. I can't tell you what this is. So it certainly is not a business record that Chili's maintained in the ordinary course of business. Do you think, even if it were a business, if the document itself is a business record, but it cuts and pastes other hearsay statements, that doesn't absolve those, it's like a double hearsay issue, isn't it? Like, I have a business record, but I'm cutting and pasting an email that's hearsay. So I have to have a hearsay exception for that statement too, right? I think that's right, Your Honor. I think there are layers of problems with getting the TMR report before. Do you think, if the TMR report is excluded, have they met a burden of production on putting forth a legitimate non-discriminatory reason? They haven't, Your Honor. Without the TMR report, Brinker has nothing. Its witnesses say, I couldn't... Well, wait, what about your own client's testimony in his deposition that, the way I read it, he understood that he was being fired because of culture, and he had a certain understanding of what that was. I mean, I understand at times in depositions he says, I'm not sure, it seems kind of vague, but then at other times he says, well, here's what I understand the culture to be. Why wouldn't that be enough for them to meet their burden of production? A few points to that, Your Honor. First of all, Mr. Keene ultimately testified that he was fired because of age, not culture. That's what he believed. I'm saying what he was told, okay? I believe in his deposition he said, I was told I was being fired because of culture. I understand you dispute that that was the actual reason that's why we're here. But, I mean, all I'm saying is, if their burden is to put forth a burden of production of a legitimate non-discriminatory reason, and he says, the reason they told me the reason I'm fired is culture, why is that not enough to meet their burden of production without the TMR report? My answer is still no, Your Honor, because even though Keene may have testified that he had a general understanding of some of the metrics that Brinker typically used when it was assessing culture, I'll say again that Brinker said, well, we didn't rely on any of those when we fired you, Mr. Keene. It disclaimed reliance on performance evaluations or any objective documents that would be in Chile's corporate personnel file for Mr. Keene. And it didn't give him any reasons beyond culture, full stop. And that led the district court to start inventing reasons on behalf of Brinker that it never actually offered. The district... But the only thing that Brinker had, you're saying, was Brinker's person saying to Keene when she fired him, we're firing you because of culture? That's correct. When Marsha Gilbert walked into Murfreesboro, she said, we want to create a different culture in your restaurant. And Keene said, what do you mean? And she said, we can't discuss this anymore. Please pack your bags. Don't speak to anyone and leave. He was never told anything else about the reason that Brinker decided to fire him. And right away when he called HR, he said, I think this is about my age. Because he'd observed the pattern of employees like him pushing 60, being kicked out, replaced by young millennials. What did HR say then? HR expressed concern, Kristen Stouffer herself expressed concern that there wasn't any documentation assuming that... Keene called HR after Gilbert told him, pack your bags. Who did he speak with then? He spoke with Kristen Stouffer. And she didn't give him any more details? She didn't. She didn't know anything about the situation. Stouffer wasn't a decision maker. She wasn't looped in on whatever conversations occurred between Aponte and Gilbert and Rich Kissel. She couldn't give him more information. And at his deposition, Mr. Keene was very clear. He said, I asked everybody. Nobody could tell me what the reason was. Nobody would tell me what the specific cultural problem was. And to return to Judge Nobandian's question, the problem at step two of McDonald-Douglas, culture is such a prime reason that employers can offer. It's a one size fits all reason. It goes to fit. And certainly that kind of subjective analysis can have a place in employment decision making. We're not asking this court to sit as a super personnel department. But you have to say more than just culture. What about there was an email exchange with the EEOC at some point where he said something about this issue, right? That they had said that it was culture. Does that document have any more, A, is that document in the record? B, does it have any more information about culture or what they told him? Your Honor, if we're thinking of the same email, it is in the record. But it doesn't have any more information because there wasn't any more to give. Mr. Keene, I believe, told the EEOC they said culture. And that's all they said. That's all she wrote in this case. So if you look through the documentary record, you are not, I submit, going to find any more details about what exactly Brinker meant when it said to Keene, you're creating a problematic culture. And on this issue, even if the burden is met at step two, turning to pretext, there are Is your red light on? Your Honor, it is. And I concede I didn't notice it. My apologies. Are these a new system? Because the red light for us is like the thumbnail side. That's all that I see. I was too involved in my answer to your question. So we were both involved. Any further questions? I think we'll let you save your time for me. Thank you, Your Honor. Good afternoon, Your Honors. My name is Jennifer Roosey, and I'm here on behalf of the appellees. May it please the Court. This is an age discrimination case. However, there is no evidence that age played any role in Mr. Keene's termination, let alone was the but-for clause of it. Why couldn't it be part of culture? Pardon? When you use the word culture, why can't that be age? I'm not aware of culture being correlated with age, and no one has ever suggested that in this case. I didn't suggest anything about culture, but I'm just saying, or as I understand it, I'm just saying why isn't age a cultural factor? Your Honor, I'm not aware of age ever being considered a cultural factor. There's no age-related comments in this case. But there was this idea that Mr. Keene is putting forth, that Chili's wanted to appeal to millennials, or young people, whatever they're defined as, and that he was 59, and he was not part of that culture because he was 59, whereas millennials are, however old, 20s, 30s, whatever. So Mr. Keene's argument in that regard is actually very disingenuous, because in making that argument, they chopped up a statement and said, we're appealing to millennials, and left out the rest of the sentence, and everyone else who's always come before us and now has divorced us now that the love is gone. Chili's wants to appeal to everyone, and there's nothing that indicates that his problematic culture was due to his age. Chili's, Marsha Gilbert received numerous complaints about Mr. Keene, and Mr. Keene does not dispute that. Are the complaints in our record? One of the complaints was oral, and it was made to Ms. Gilbert, and Ms. Gilbert then informed Mr. Keene of this complaint. So Mr. Keene was on notice that complaints had been made about him and the culture in his restaurant. But you just said one of the complaints. Correct. And then the next complaint was by Mr. Rondell Brown, and it is in the record. It is in the TMR report. And he was the person who was fired contemporaneously for his own improper behavior, including smoking and so forth. Correct. So they ran a tight ship. Anyone who was having a cultural problem, they got rid of. And importantly, Ms. Gilbert received this complaint about Mr. Brown, or from Mr. Brown, and she turned it over to Team Member Relations, and Kristen Sofer conducted an investigation into that complaint. And in conducting that investigation, numerous people conferred, and they determined that there were some issues at that restaurant with culture. And this is the proverbial case of the new sheriff in town. Ms. Gilbert had been brought into this position after the former district, the DO, had been let go because he was not holding anyone accountable. Wasn't it a little bit odd if she was going to fire him for culture reasons, that she hadn't been to the place where he worked and was the manager in order to ascertain the culture? Well, she didn't need to, in that she had already experienced it herself. When she called Mr. Keene to let him know about the complaint that she received, he called her back and nastily told her that she was unprofessional for calling him on his day off, and he didn't want to do training in that restaurant anyway. So she could see that this is the attitude that he had towards his boss. She could certainly believe that this is the attitude that he had towards his subordinates. So I'd like to address the TMR report. The admissibility of the TMR report was not raised at the lower court, and so it has been waived. Mr. Keene cannot put that issue before the Sixth Circuit. There was a statement about the admissibility in the sanctions motion or something, as I recall. I mean, it's not like you're surprised that they're saying it's not admissible, are you? They requested that it be excluded as a sanction. There was never an argument. I mean, it probably should have been, honestly. I mean, it's either inadmissible or you all destroyed evidence, so I don't see how this Well, it is a business record. But that's not really authentic. I mean, you have to have an authentication, and you have to have a hearsay exception, I suppose. What is the authentication? That is Mrs. Abrera's declaration. She is the TMR manager. She knows that this is how this system works. But she testifies that this document basically contains all of the e-mails on this subject. But how would she know that if she wasn't on? Was she on every e-mail? Because it doesn't look like in the TMR report that she's copied on every e-mail. So how does she even know? Kristin Abrera is not on any of the e-mails. She is the manager. This is her department, and she is testifying as to how the system works, that it is supposed to capture every e-mail. And that's the point of the business record exception or authentication. No, the point of the business record exception is for somebody to say, I've been in HR for 20 years at this company. Every time we fire somebody, we put one of these together, where we compile all of the e-mails, et cetera, et cetera, because it's kept in the regular course of our business. All I see in that declaration is just a conclusory statement that this is regularly kept or something like that. There's no meat on the bones. Like how many of them have you done in your career? Like if she said, oh, I've done 100 of these, or I know I'm aware of 100 of these, and this is just one of them, there's none of that in there, is there? There are not in that declaration, but that was the intent of the declaration, that everything, that is how the system works. Even if this were a business record, it would not be admissible, would it? It's like you heard my past life, medical, legal things. You can introduce the medical record, but there's a ton of hearsay in those records that are not admissible. All the diagnosis and all those things, a finder of fact would like to cross-examine those people. So I don't think you can hide behind it's a business record. Even if it were not admissible as a business record, I think Judge Nalbandian's point is a good one, in that Brinker also has plenty of basis to show that the reason was culture, in that Mr. Keene himself testified that that is what he was told by Ms. Gilbert. There is a document in the system. It is document number 3417 in the record where she entered that the termination reason is culture. I don't see how that can't be but a fact question for a jury to decide whether in fact Mr. Keene was fired because he was not meeting these amorphous culture requirements, or in fact he was fired because he was old. Well, Your Honor, age is, as you know, ADEA, you must prove that age is not just, can't be a motivating factor, it has to be the but-for factor. And there's absolutely no evidence that age played any role in this decision. As noted before, the only comments regarding age were made four to five years prior to his- The whole point of McDonnell Douglas is you don't need direct evidence, right? So, the privatization case, then we have the legitimate non-discriminatory reason, which I'm a little bit skeptical about if the TMR report is gone, but let's say, all right, fine. From his depo, he says that, I was told there were complaints made and it's culture, and then he just has to put forth some evidence of pretext, and I'm not sure, why hasn't he done that? It seems like he's done that. Your Honor, I disagree. He has said that some co-workers, peers, called him, like you said, pops, grandpa, which he never reported, and he did not appear to take any offense to five years ago. There's no evidence that Ms. Gilbert or Kissel or Stover or anybody who was involved in the decision to terminate him ever made any such comments or held any such biases. But why didn't he get a performance improvement plan? Why didn't he get the progressive discipline? I mean, it just seems like they jumped straight to firing him. Well, and again, I mean, it's employment at will. They can do that, but the performance improvement plan, first of all, that wasn't raised at the lower court either, and we don't think that argument should be present before the court, but there isn't, you know, they haven't even put any evidence in the record as to what the policy is. The only evidence they have of any policy about a progressive discipline is some vague testimony by a former disgruntled. You're saying there is no progressive discipline policy at the company? There is, but it's not in the record, Your Honor, but this was not, they actually Did they follow the progressive discipline policy? It allows you to move straight to termination, and there's no Wouldn't that just be for some really serious thing, like if the employee was stealing from the cash register or something? It can be for anything, but the reason they didn't follow it in this one is because it was inherent in the way he treated his employees, and they did not feel that it could be coached, and they had done it before. It talks about they've worked with him a few times, and this was the environment he was creating. They really didn't believe that, you know, talking to him about creating a new culture would help. And in fact, Ms. Gilbert had talked to him previously about the prior complaint, and he still was getting complaints about the culture that he was creating. So correct me if I'm wrong. My understanding is that there are not documents in the record that would be normally kept by an employer documenting evaluations of his performance over the last few years before he was fired. Is that correct? That is correct, Your Honor. They were unfortunately, and that is a fact of this matter, and I don't think we'd be here if we had those documents. The company did issue a litigation hold notice, and unfortunately some of those documents were not retained. No one disputes that Mr. King did get positive performance reviews under a prior supervisor who was, in fact, terminated for not holding anyone accountable. And again, his performance reviews, metrics, things like that, did not play a role in the decision to terminate Mr. King. Because they were, we must assume, favorable towards him, correct? Well, no, Your Honor. They just didn't play a role. They got complaints that this man is trading African Americans poorly. None of your witnesses could remember terminating the guy. Well, and that is unfortunate. This case sat around for many years at the EEOC, and Mr. King never requested a right to sue. We had to wait for the EEOC, and people left. Unfortunately, Ms. Gilbert is on medication that causes her to lose her memory. But we have this report that shows that it was culture, and Mr. King testified himself. That is the reason he was given. That is the reason in the termination report, not just the TMR report, but the termination report that's in the system. And that is consistent with the complaints that he acknowledges that he received regarding his treatment of employees. So who does King say complained that he knows about his culture? Melissa Stone Street complained, and then Rondell Brown complained. Okay, and Brown is the man that he fired for misbehavior at the workplace. Correct. And Stone Street was the friend of Gilbert who did the firing because of culture. Correct.  And, again, Ms. Gilbert is 52 years old. But people can discriminate against their own. Oh, they absolutely can, but there's no evidence that Ms. Gilbert did in this instance. There's no evidence that Ms. Gilbert had age bias. She terminated a 33-year-old employee also for culture, which I think is strong evidence that culture does not mean age. She apparently knew Sheriff in town and wants to promote the Chili's culture, which King testified. What does it mean? King testified that culture was all they talked about. It's how you treat the guests. Who testified? King testified that culture was all that Brinker talked about, and he never questioned it. He seemed to know what it means. It's how you treat the guests. It's how you treat the employees. It's how you treat your other managers. Is that how Chili defines culture? Pardon? Is that how Chili's restaurant defines culture? There is not an actual defined term, culture, as is noted. It is an amorphous term, but it's subjective. But subjective reason isn't per se evidence of pretext. There's, again, complaints in the restaurant about how he treats people, the way he treated Ms. Gilbert. Wasn't it the third best-performing Chili's in the region, whatever the region is? I'm not sure if it's ranking, but, again, this isn't about metrics and how well the sales were. This is about how he treated people and how they felt. And as evidenced, we talked about the Me reports. After he was gone, numerous employees reported that they were so glad he was gone, the new manager is so much better, the culture is so much better, the best thing they ever could have done is getting rid of Keene. Again, these weren't relied upon, but this is evidence of the employees at the time that he was terminated did not believe that he was treating them fairly. They reported this to Ms. Gilbert, and she took action to improve the culture of the restaurant. And apparently she did because the new surveys. Wouldn't one of the actions she would take, if somebody said the culture is bad here, wouldn't she say in what way? Well, and, you know, again, this was an oral complaint, so I'm not sure if she did. But in hindsight, it's 2020. We would like that she did that. But we do know that Rondell Brown, when he complained, he mentioned many things. He said that he felt that African Americans were treated poorly, that Mr. Keene played favorites. If you were not one of his favorites, then he was very rude to you. He didn't schedule you well. He had some employees that he got along with very well, but there were some that he created a real sort of a favoritism scenario. Just a fact question. Did Mr. Brown's detailed statements that you're telling us come to Gilbert's attention before she fired Keene?  So Brown wrote a statement, or was it an oral statement to Gilbert, or how did Gilbert find out? He called Gilbert, and Gilbert turned it over to TMR to do the investigation, and then Kristen Stouffer did the investigation where she spoke with Brown and she reported her findings back to Gilbert. And then Gilbert fired Keene? Correct. Gilbert and Hector Aponte conferred, and Mr. Aponte had been in TMR, Team Member Relations, or People Works, and had prior knowledge of other complaints about Mr. Keene as well, and they conferred and then agreed to move forward with the separation. Remind me what TMR stands for, Team Member Relations? Team Member Relations. Brinker calls its employees team members. Team members, thank you. And your red light is on. Our red light is on. I wanted to finish your question. I love that I'm paying attention to the lights. Thank you. Thank you. Just two points, Your Honors. What you heard from Ms. Rusi just now is, I think, a very compelling closing argument to a jury, and that's the punchline in this case. Brinker's position is essentially asking this court to double down on the error that the district court made and to draw every possible inference in Brinker's favor. That's not what summary judgment is for. That's why we have juries, and that's why we have trials. And in a case like this, where I think the weaker the employer's reason at Step 2, the less a plaintiff has to do, the less he has to show, in order to satisfy McDonnell Douglas and get a trial before a jury of his peers. Sounds like they're not going to have any witnesses at trial. Yeah, and that's something that the jury can weigh, right? When Brinker's witnesses take the stand and remember nothing, and Mr. Keene takes the stand and puts forth his version of the story, a jury has to sort out those weight-of-the-evidence questions, those reliability questions, those credibility questions. And here, there is plenty in this record, putting aside the memory loss of Brinker's witnesses for a jury to find on the ultimate issue that Brinker fired Keene because of his age. And one just technical point, Your Honor, to the forfeiture point or waiver point that Brinker was making, if you look to the reply brief that we filed at pages 6, 10, and 14 through 15, if you'd like citations in the record to where the arguments at issue were raised below, and they all were raised below, you can find them there. And since the admissibility argument is something Brinker raised specifically, that's at docket 48, page ID 1092. It wasn't just raised in the sanctions motion. It was also raised in Keene's opposition to Brinker's motion for summary judgment. The admissibility question is squarely before the court. So unless there are further questions, I'll let you know. Also, you were appealing, am I correct, the sanctions motion result? That's right. So if we were to believe that the TMR report was not admissible and that there had been spoliation, a sanction for spoliation could be to deny the admissibility of the TMR report. Is that correct? It could. There were an array of options before the district court on the sanctions motion, and that would have been one of them. Because the district court's sanction was simply to say that your costs would be needed to be paid by Brinker, but you were not getting any other sanction for the spoliation. Is that correct?  Unless there are further questions, I'll restate. But if the TMR report is inadmissible, is there a further sanction that you would want? I think that's something that would be in the district court's discretion, Your Honor. If the TMR report is inadmissible as a matter of law, that's a separate question than whether there should be a sanction that restores Keene to the position he was in before there was spoliation. Certainly I think exclusion would be one appropriate remedy. No, but does the spoliation have some effect beyond the TMR report? Would you be entitled to something else? Certainly the court had the option of giving some sort of adverse inference. It could have denied summary judgment to Brinker as a sanction. But what would that be? If the TMR report were not admitted into evidence, what kind of adverse inference would you get? The TMR report and the spoliation are separate questions. So, Your Honor, I think one adverse inference that the court could ask the jury to draw is the fact that Brinker destroyed key evidence. The contents of that evidence could be assumed to be favorable to Keene, and that's separate from the TMR report's admissibility. Okay. All right. Thank you, Your Honors. Thank you both. The case will be submitted.